Good morning. I have a suggestion. You don't have to accept it, but the panel would like to hear the Commonwealth's appeal first. In other words, we'll hear your side of the case and your response and then whatever rebuttal. We'll split the time. And then we'll hear Rollins' appeal with the response and the rebuttal. I think it's too complicated if you each had to go into all of the issues at one time. Does that agree with all? I don't know what we'd do if it wasn't agreeable. We may have to assert executive privilege and make a decision. We'll proceed with the Commonwealth's appeal. Fifteen minutes per minute for rebuttal on the first. Sure, you can have as much rebuttal as you need. And I can't speak for my brothers in the panel, but the clock is liberally applied here. Thank you, Your Honor. Good morning. May it please the Court. My name is Tom Daldrin. I'm from the Philadelphia District Attorney's Office representing the Commonwealth appellants and cross appellees. So Harris Rollins was convicted in 1987 of murdering a man named Raymond Cintron as Cintron's sister and her one-year-old child watched. A few days after that murder, he was arrested after a different shootout. What was the outcome of the other shootout? I don't believe, Your Honor. Do you mean in terms of did someone die or was he convicted? Was there a prosecution or what happened? Off the top of my head, I'm not sure. I believe, I know at the time of the trial, there had not been a prosecution. My best guess is that there was not a separate prosecution. That's irrelevant to any issue posed for adjudication before us. That is correct. Now you're talking about the Campbell or you're talking about the 1982 murder? I believe Judge Greenberg was talking about the Campbell shootout rather than the... Yeah, the second shootout. Right. Whereas the 1982 murder predated events here. Obviously, Your Honors are well acquainted with the record, so I will just proceed with the two issues on our appeal. The District Court granted relief with respect to the sentencing phase on the jury instruction claim and the ineffectiveness claim for failure to investigate and present mitigating evidence. Let me go first to the Mills claim. Since the briefing began, as Your Honors are no doubt aware, the legal landscape has significantly changed because the United States Supreme Court decided the case of Smith v. Spisak. You were very happy when you saw that case, I'm sure. Well, it made my job a bit easier here. I know that the Supreme Court also reversed and remanded the Abu Jamal case, which is currently pending before a different panel of this court, for reconsideration of this very issue in light of Spisak. The jury instructions in Spisak are very similar to those in this case. I'm not going to spend a lot of time on the actual language, because that's something that's just apparent on the record. They're quite similar. Informed charge. Exactly. Opposing counsel makes the argument that they're different. I think that's a strange argument, and I think they speak for themselves. I think what we're left with is the question of standard of review, because Spisak was, in fact, a deference case. That is, this U.S. Supreme Court applied deference under the current habeas statute, 2254 D2. Well, how is Spisak different from the charge in this case? Let's get down to the nitty-gritty. I believe, essentially, it's not. In Spisak, there was similar language in which the jury was told that it had to be unanimous in finding aggravating circumstances, and it had to be unanimous with respect to the result. And the concern in Spisak was the same concern as in this case, that the jury, though not so instructed, would misunderstand the instruction. But, you know, in Abu Jamal, the exact same judge, the exact same charge was given. And in Abu Jamal, the Supreme Court did not reverse. They remanded and told us – they vacated and remanded for further consideration. They didn't say the Mills decision decided by the Court of Appeals was wrong. They said they just remanded it. So it's still an open question, isn't it? Even at the Spisak, where the Spisak Court dealt with the issue almost left-handed. It was almost – well, it was unanimous. It was not a lot of analysis. Well, there wasn't a great deal of analysis, I think, because the Court was so convinced that it was correct. That it was not a Mills case. I mean, that they looked at the language, and they quoted the very same sort of language that's been at issue in this circuit. They quoted simply to explain, this is correct to us. So your position, if I understand it, is that even though the jury is not told that insofar as mitigating circumstances are concerned, that any one juror can disagree and find the mitigating circumstances preponderate. Is that your position? Yes, because remember that Mills v. Maryland doesn't create an affirmative requirement that the jurors be told that mitigating circumstances need not be unanimous. What Mills says is they can't be told the opposite. That is, in Mills, the jury was specifically told, you have to all agree on each mitigating circumstance before you can consider it. What we have here, and what we had in Spisak, and what we have in Abu Jamal, is a case instructions that do not tell the jury that they have to be unanimous with mitigating circumstances. The question is whether or not there was a likelihood of confusion on that point. Well, is there confusion when the word unanimous is in such close proximity to the discussion concerning mitigating factors? Well, the Supreme Court didn't think so in Spisak. The word unanimous was not used, but the instructions there said if all 12 jurors find, by proof, beyond a reasonable doubt, you have identical instructions on unanimity. That's our position. And I would also say that the verdict slip, which is also an issue in this case. Is it really? I don't see a real challenge in the verdict slip here. The word unanimity is not even used. Well, that was my point. I think, as I understood the argument on the other side, is that it reinforces... Your Honor, that was our point, that because it doesn't use the word unanimous, then the verdict slip is actually clearer. And one thing, I believe that the opposing counsels made the point that the verdict slip, one reason it was supposedly more confusing than the oral instructions is because it had a page of check marks where the jury was to check the presence of mitigating circumstances. The same checklist was President Smith versus Spisak. So I don't think that goes anywhere. There are some relatively thorny issues of the standard of review. Before you get there. Yeah. This case is before the panel in Abu Jamal and virtually identical jury instructions there to those here. Should we wait for the panel in Abu Jamal to decide? Well, Your Honor, I have no opinion about that. We decide it first and let them have to follow us. I think it's not uncommon for there to be one issue percolating up before different panels, but I think that's obviously something the court will have to consider. If we were to... One last question and then I'll keep quiet. If we were to find the ineffectiveness of counsel, do we have to reach this issue? No, Your Honor, because Mills was decided after the trial in this case. So if the court finds that ineffectiveness is fairly posed, as we argued then, the actual... No, I'm talking about if we were to find the ineffectiveness at the penalty thing. Oh, excuse me. I figured you had misunderstood my question. I was unclear. No, I mean, obviously, if you've... If we decide that the district judge was right in finding that there was ineffectiveness of counsel and, you know, he reviewed under the right standards, etc., etc., if we affirm on that, do we have to decide the Mills issue? No, obviously. And, in fact, this is something that came up in, I believe, Albrecht v. Horn. If the court did go so far as to decide this issue, having also already thrown out the penalty phase on mitigation, it would end up being dicta as with respect to the Mills claim. So... You don't have to reach it. That's right. You don't have to reach it. So why don't you get into the other point? Okay. I do want to say, before I go to the other claim, there are some significant standard review issues. We've addressed them in the brief, and I know the court will give them some serious consideration. Let me talk about the mitigation claim. Once again, because this is a habeas case, because this is a capital case, there are significant issues about the standard review. But first, I want to get to the nub of it, which is why this case is different from the myriad cases on which my friends across the aisle rely. Put to one side, just for a moment, that there's been no hearing, which I think is a critical point. Just on the merits, there is, first of all, there's not one contemporaneous record of which I'm aware reflecting the brain damage, the alleged brain damage of these youths. Not one. There are no school records. There's nothing. What we have are affidavits and statements from family members and from experts who repeat the allegations of family members. That's number one. You had testing. You had a statement from a neuropsychologist. You had two psychologists. You had a social worker on the other side. Did you come forward with any experts? Absolutely not, because we said there should not be a hearing. We said that we should win on the papers. But now you're saying there wasn't a hearing, and you're complaining. Well, Your Honor, it's like any garden variety motion to dismiss or summary judgment. If we say we're entitled to win on the papers, if that is rejected, we haven't waived our right to a hearing, and we haven't somehow waived the petitioner's burden to prove his claims. Now, you're correct that the affidavits from the experts contained conclusory statements about various tests. We haven't seen those. I didn't say they contained conclusory statements. The word conclusory was mine, Your Honor. I apologize. But we haven't seen those tests. We haven't seen the data. We believe, given the differences in this case, we should win on the burden. Well, the petitioner didn't even know his client's blood type. According to the grandmother and the sister, he didn't even prepare them for trial. It appears that he went into this really looking to break gums at the guilt phase, but had absolutely nothing prepared for the penalty phase. At least he should have done some work. There's no record of his having exhausted any type of investigation as to mitigating circumstances vis-a-vis his upbringing, support of family, abuse, and so forth. Given that state of affairs, why is it there sufficient here to affirm it on that basis? Well, Your Honor, a couple of things. First of all, there was a case in mitigation. There were four witnesses presented. It's true that there was that Mr. Meehan, now Judge Meehan, has said in an affidavit or a statement that he didn't prepare for the penalty phase. Again, that has not been tested. The grandmother said she was shocked when she was called. All you have to do is read the testimony of those four witnesses, and those witnesses who appear were not prepared. Well, the fact that witnesses are nervous... No, no, no. We're not prepared. They weren't spoken to, or there was nothing done to exhaust their... whatever the knowledge was. I'm not saying it's meritorious, but there was nothing done to explore what, if anything, was there concerning his lifestyle as a young man. Well, if you can say... well, that's a separate issue, whether or not that is required, that that specific discussion be held. But if your honors are confident that, as a matter of fact, on this record, you can state as a matter of fact that counsel did not prepare these witnesses, even though there hasn't been a hearing on that issue, that's where you would end up. We still... Well, two of them said he never even spoke to them. Well, that's what they said in the untested affidavit. And then Rollins wasn't going to testify, and then he spoke to them, and he said he was going to testify, and there was no continuance. There was no... just even to talk to them about his testimony. Rollins gets up there, and, you know, there are some questions, some answers, and he blurts out that he's really innocent, and that's the end of that. Nothing as to his background, his lifestyle, his abuse, because the attorney clearly didn't know anything. There's been no investigation. Your Honor, in Thomas v. Horn and Lewis v. Horn, this Court has made clear that it's going to be an extraordinary step to find, as a matter of fact, that counsel did or did not do anything without first having a hearing on the subject. Are you suggesting that we demand the matter for a hearing to be held on this point in the District Court? Yes, Your Honor. If this Court believes there's a need to go further, then there should be a hearing. There's a need to go further? In other words, the Commonwealth, the conviction can be affirmed without a hearing, but the writ cannot be granted without a hearing. That's our position. In other words, if you believe that the papers, as of right now, don't dispose of this claim... Well, I was only talking about the penalty preparation. Correct, and that's what I'm talking about, too. You're saying the writ cannot be granted without a hearing? Yes. Yes, I believe that. Isn't there enough on this record? The defense attorney himself made declarations as to what he did and didn't do. In an affidavit, and we had never cross-examined him. Well, why do we have to have an evidentiary hearing if that's the allegation that he makes? Because in habeas, the standard is not that you assume the truth of the allegation in order to prove entitlement to a writ of habeas corpus in which a state court judgment is invalidated. That has to be proved. Would you also have to have proven that, or could you test that the grandmother was lying when she says she was shocked when called and never prepped for a trial? Yes. Well, I don't know if that's... It might be a difficult cross-examination, Your Honor, and the... Well, let's forget about facts right now. The PCRA court made some mistakes. It didn't mention, for example, the declarations... It didn't even mention the declarations of the lay witnesses. The PCRA court limited itself to analyzing whether Rollins' evidence satisfied only one mitigating factor, and that is his capacity to appreciate the criminality of his conduct or conform his conduct to law. It did not go into what his experts said, the suffering from an extreme mental-emotional disturbance, severe psychological-physical trauma, the profound effect all of this had on his ability to understand, his ability to withstand stress. I mean, do we have to... Where is a hearing required on any of this? They totally dropped the court, dropped the ball on this. That's as a matter of law, one could argue. As a matter of law, one might... The most one could find, it seems to me, that the Pennsylvania Supreme Court and the Pennsylvania lower court, the PCRA court, didn't decide the right claim. That's not the basis on which habeas relief can be granted. Habeas relief can only be granted if the petitioner proves there's been a constitutional violation, and it's not... The fact that the state court does not decide a claim is not sufficient to grant relief. That has to be proved. That's a simple... Well, but can we say the PCRA courts, as the district court did, finding of no prejudice was an unreasonable application of stress? That's really all we have to say, don't we? Isn't it? And then, it seems to me, you'd have to have a hearing. Well... Under Lewis and Thomas, relief can't be granted without hearing. But your position, as I understand, is that based on this record, we have to have a hearing to determine the facts as to whether or not the record that we have before us is credible, to... Sufficient to grant a petition. That's correct. Well, why would... Well, in other words, your position is that everything has to be... You have to have the opportunity to prove that these are false allegations concerning his lack of preparation. When even the defense attorney, I think, his time records reflected that he didn't do any time on this particular aspect. Well, he conceded. He conceded he didn't. Well, if his... Do we have... You're saying we don't have to accept his concession? That's correct. His admission. We don't have to. That's correct. Why should we not? Because lawyer-created affidavits in these cases are so common, and what you have to do is, if there's a need to go further, then you have to have a connection point. Well, you're saying he threw himself under the bus to the client. Well, but read the record. Well, what have you put forward to show that there's substantial or credible evidence that all of this information, which is before us, showing not doing a credible job on the penalty phase is subject to dispute? What have you put forward to show that defense attorneys' statements that he exerted no time on this, that these witnesses said they weren't prepared? Is there anything you have on this record which reflects that this is all balderdash? What we've done is said that all the fact witnesses are biased, and it's not a summary judgment motion. The truth of these allegations is not presumed if we don't rebut. We know they're biased. We know the family's in favor of the defendant. That's not bias. That's natural. We know their inclination is to save a guy, but what shows that they lied when they said they were not prepared, and he put no work into this aspect of the case, concentrating only on the guilt phase and so forth? Well, a couple things. First of all, our focus has always been, and I think we're missing a big point here, our focus has always been on the prejudice. That is that there is not one shred of contemporaneous evidence that these allegations of abuse, negligence are actually true. It's all family members. So there's two issues. One, did counsel conduct an investigation? And number two, if he had, let's assume he had not, and we say that he was unreasonable, then that does not mean that there's a new penalty phase, because part of Strickland is, and it's not simply error and then harmless error. There's no Strickland error if there is no prejudice, if the trial was not fair. The district court found that Waukee Crawford was powerful mitigating evidence, powerful mitigating evidence. And that it was reasonable likelihood, whatever the standard is, that if the jury heard it, they would have found that the mitigating circumstances outweigh the evidence. That's a very strong statement. But we haven't seen the test administered. We haven't, I mean, it's all so conclusory. We haven't seen- But you came back with nothing. Well, we don't have to. It's not our burden to rebut. If we had to rebut with an expert every time an affidavit was filed in these cases, we were talking hundreds of thousands of dollars. Well, one can say by not rebutting, you're not challenging his submission. We're not, that's not true. By not rebutting, we can point out- It's like cross-examining- And challenge. His submission has been unchallenged. That's not true, Your Honor, respectfully. If someone files a motion to dismiss, if I file, if the other side files a motion to  dismiss, the allegations in that motion to dismiss don't meet the standard because on their face there are holes. That's essentially what we can do in PCRA and what we did here, and we won in the state court. We lost before the district court. But the idea that we have somehow waived our right to a hearing or that the petitioner's burden to prove under the Constitution that his judgment is unconstitutional has somehow been relieved simply because he has filed affidavits from doctors that he has hired who have conclusions about tests that we have not seen, based on data that we have not seen. The idea that that is enough, that that is, I mean, remember in this case, this is a case where there was serious courage displayed by many witnesses. This is a guy who, and I'm not talking outside the record, this record is filled with witness intimidation. That's not the issue. Well, it's not the issue with respect to this, although it is the issue with respect to a couple of the other things. I'll get to that on my... We've let you go very long. I'm sorry, I was taking away. You know, I can't help but think myself, I used to be a state trial judge. I would hear people testify in great detail about a conversation eight years before. Then I would think back in my own mind about conversations I had. This trial was before I was even sworn into this court, which was in June of 1987. This is over 23 years ago. Can people really remember the... Well, Your Honor, and I apologize for taking time. I'm not saying this is going to be an easy hearing. I'm not saying that we will necessarily win this hearing. The fee petition, I think, if I could just... One last point. The fee petition is interesting because if you believe the fee petition, he never even spoke to the witnesses that he actually called at the sentencing hearing. In other words, it's not meant to be, and it wasn't, an exhaustive document, you know, documenting every conversation. What was the process to reflect that the affidavit was incorrect? Well, his statements at trial in which he said, I called the witnesses that I wanted to call. None of them wanted to come. That contradicts the affidavit. I mean, we didn't have to respond. Well, not really. He could have, in that gap between 4.30 in the afternoon of March 4th at 11 o'clock in the morning when the verdict came in, he could have contacted some people. He could have. So it's not necessarily inferences. But the federal court's job is not to presume to give him the benefit of every doubt at this stage. Well, at this stage, we're talking about what happened 24 years ago. And lest you worry, wait till I get your friends on the other side on any possible bats in the hearing. We'll treat them the same way.  We'll get back to the rebuttal. Thank you, Your Honor. Mr. Lowry? May it please the Court. Matthew Lowry on behalf of the habeas petitioner, Seharis Rollins. With respect to the deficient performance side on ineffective assistance, the penalty phase, as the discussion has indicated, we have an affidavit from a trial counsel who's now a sitting judge. Essentially, I dropped the ball. I didn't prepare for penalty phase. Well, that doesn't give any more credibility to a sitting judge. Does it mean his affidavit is entitled to any more credibility than anyone else? Does it? Um, not necessarily. I think it's – I think it's relevant. But I think – Relevant in what way that he's a sitting judge? Why do you even bring it up? Because I thought it was relevant. But more to the point, even, what he says in his affidavit about failure to prepare is fully borne out by the record from the trial proceeding. Yeah, but we have – that – these statements by me and the grandmother and so forth have never been challenged, as counsel has said, in cross-examination or examined in any way other than in their fair allegations that this penalty phase was not properly presented, not enough work was done on it. It – you know, I think that the allegations as to deficient performance, as I said, are supported not just by the affidavit but by the trial record and by counsel's own time records. And then if you look at the deficient – or the prejudice side of it, you know, I don't understand how you're going to really challenge the fact that Mr. Rollins' mother abandoned him and a brother and left. Now, if they want to say that wasn't because of abuse, but that – the fact that she left the family indicates that there's something seriously wrong in this family. Like, for example, in Bond from this court. And then the fact that four members of his family died in quick succession, I don't think that can really be contested. And I don't think – and the other thing is that the Commonwealth hasn't really tried to contest the allegations, which are not just allegations but they're backed up by these eight affidavits from family and friend and four affidavits from experts. They haven't – they didn't try to factually challenge the allegations and the affidavits until – at all. They didn't really ask for a hearing until after they lost in the district court. They didn't ask – But how hard would it be to have an evidentiary hearing concerning these allegations and allow the state to – the Commonwealth to proceed with its side of the story? We can – we can certainly do that. We can – and we can be back up here in three or four years with the same record showing, as Judge Joyner found, that Mr. Rollins is clearly entitled to relief on the penalty phase based on what is really a clear, uncontested record of complete failure to investigate and prepare for penalty phase. What's our standard of review here? What are we – what would you have us say? What is our standard of review? What are we looking at here? Our review of Judge Joyner or – Yeah. Well, I mean, what do we do – what do we do with the district court's opinion? Well, it's – because there was not an evidentiary hearing, it's technically plenary review. Now – Are we talking deficiency? Are we talking prejudice? What are we talking about here? We're talking about both deficient performance and prejudice. But we're reviewing what Judge Joyner did. Now, his review should have been at the review, correct? Correct. All right. The PCA – PCRA court found no prejudice. The Pennsylvania Supreme Court found no deficiency, right? That's correct. And that's what – that's what we're reviewing the district court's determination as to those, correct? Yeah. Well, actually, in Simmons, the Third Circuit said when you have this kind of situation where the – where the appellate court – the state appellate court does something different from what the state trial court did, that you just need to look at the state appellate court. But either way, if you want to look at both of them, neither of them addressed the life history mitigating evidence. They both looked only at mental health-related evidence. And Judge Sabo looked only at the E3 mitigating factor. He didn't even consider whether the mental health evidence would support mitigation under E8. Well, that's all that was before them. To – in respect to the rest of the claim, it was defaulted. The state court reviewed what was before it. And therefore, didn't Judge Joyner, when he reviewed what was done in state court, have an EPA review? It is our determination to – our standard review was whether Judge Joyner appropriately gave a sufficient deference to the state court or just went off on his own and found facts which he felt were different than what the state court did. Well, Judge – I'm confident that I'm correct in this, that Judge Joyner did apply EPA review on the IAC penalty. He did. Yes. And the facts that were – the facts that were proffered in state court are exactly the same facts that were proffered in federal court. There's not been any change in the claim. So – so, you know, He found the Pennsylvania Supreme Court's decision was contrary to and an unreasonable application of Strickland. That's correct. Why was he wrong? Why was he right? That's what you have to be telling us. Well, he was right for the reasons that I have been telling you, that you have – you have a clear case of deficient performance, a complete failure to investigate. And that's supported by – by the affidavit of counsel, by the time records, and by the record itself, which demonstrates that he hadn't prepared the witnesses. And – But your friend says we can't give relief without a hearing, even though much of what you say is not contested. We still have to give him a hearing. Well, you know, that – that's their position, and if you want to do that, we will – we will go and we will, you know, spend a few years. Do we have to do that? Is it necessary? No, you don't have to do that. You – this court – Why don't we have to do that? This court granted relief on the papers in – on similar papers in Outen and Kindler. They're both very similar. They both relied on affidavits from trial counsel and affidavits as to – as to prejudice. And – and there's – there's no difference, really, in this case. Do you want to move to the Mills issue? Yeah. Okay. We're going to move to the Mills issue, please. That's fine. Let me – let me just say, first of all, the – this court has noted problems with the instructions and verdict form in this case in the past, and – and the district court found – found Mills' error. And we should really, though, start with what does Mills say? No. We'll start with Spizak, because prior to Spizak, I think our case law would seem to compel the conclusion that the Pennsylvania Supreme Court's denial of the Mills claim was an unreasonable application of federal law. I would agree with you. But we have Spizak now. And that's coming back – coming to us with Abu Jamal, where the instructions are in Spizak, Abdul-Jamal, and Rollins. Tell me, what is the difference between the unanimity instruction in Spizak and the unanimity instruction here? There – there is no – there is no unanimity requirement in Spizak. And in fact, there is no requirement in Spizak. No, no. Spizak says as to unanimity, if all 12 members of the jury – that's unanimous – if all 12 members of the jury find that the aggravating circumstances in each separate count outweigh the mitigating factors, you must return that finding to the court. That is – Our case says the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance. I mean, it's the same thing. With all respect, it's not the same thing. First of all, what Your Honor just read, if all 12 members, that is the – that is the ultimate finding. That is, you have to be unanimous for death. You can't – you can't be split on life versus death. That is not what it says. But go right – That's not what it's saying. It doesn't say then you must return a finding of death. It says you must return that finding to the court. The finding that the aggravating circumstance outweigh the mitigating. Oh, yeah, and that's the ultimate determination. The ultimate determination is that the aggravating factors outweigh the – But that's exactly what our instruction says. With all respect, it's not. First, on Spisak, you have to understand that there is no requirement that the jury even find a mitigating factor in Ohio. That is the critical difference between this case and Spisak. And you go right up above what you were just reading. It talks about the mitigating factors present in this case. The jurors can pull anything from anywhere and say that's a mitigating factor, and they do not have to make a finding. They do not have to check a list. I've seen you raise that several times in your supplemental trial reply brief. And I don't really understand. You say that there's no requirement in Spisak for the jurors to find mitigating circumstances before considering them in the weighing process. But what is there to weigh if there hasn't been a finding? If you – and Spisak requires you find or you have to look for the mitigating factors present in the appeal, that's their language. Have you not found them? But you don't have to – you don't have to find them. There is not a list in Spisak, contrary to what opposing counsel said. They don't have to check off and say we found this one, we found that one. It's just if it's present in the case, you can consider it. Whereas in Rolland, over and over again, the sentence depends on your findings about ags and myths, and unanimously and finds are coupled all the time. And the instructions about what to do with the verdict form are exactly identical for aggravating factors and mitigating factors. The aggravating circumstance is or are, and you would put them in on the verdict form, whatever they are, and there's a spot for you to put in whatever mitigating circumstances you find. You – there is not a way – You shook your head violently when I said what I did before, that there's no – the word – unanimity is not on the verdict sheet. Where is it? Can you point me to it? No, it's true that the word unanimity is not on the verdict sheet. It's a very important distinction. I don't think that it is that, because what the verdict sheet does say is we, the jury, do hereby further find, and then it lists ags and it lists myths. Well, what's we, the jury? It's the collective jury. It's not – there's not a way to take the form in Rolland and say, okay, here's five of us. We all like good character, and so five of us check good character, and the others don't go for good character. There's – the CZAC case, in that jury, the – there was no requirement that the judge instruct the jury that mitigating factors need not be found unanimously. It left it completely blank. It left – it – unanimity or otherwise of the jury was necessary for the mitigating factors. And that's what CZAC says was critical about Mills. And that's why they – and that's why they vacated Abu Jamal and said that it was not necessary because it was not an unreasonable application, not to advise the jury in certain language that the mitigating factors need not be found unanimously. Now, I may or may not agree with that because I was on the panel that got vacated on that, but that's what the law is. The Supreme Court had said you do not have to tell the jury that your mitigating factors must be found unanimously. You can't tell the jury that. You can't. But – and even though you have to tell the jury that, it's aggravating. Now, that's what happened in this case. I mean, is that exactly what happened in this case? What CZAC says is not an unreasonable application. No, it's not at all. Because first, here's the critical language from CZAC itself about Ohio, okay? Neither the instructions nor the forms said anything about how or even whether the jury should make individual determinations that particular – that each particular mitigating circumstance existed. Now, that is totally different from Pennsylvania. They have to find each MIT before they can put it in the weighing process in Pennsylvania. That's not required in Ohio. And secondly, the other thing that CZAC says about Mills is red naturally – under Mills, you have to look at red naturally, is there a requirement of unanimity? And if you read the Rollins jury instructions and the verdict form naturally, there is no way for less than a unanimous jury to A, find a mitigating factor, and then B, take that mitigating factor that some but not all of them found and consider it in the weighing process. There's not a way to do that. Going back to CZAC, you will acknowledge that looking at the charge to the jury in the CZAC case, there was no way for that jury to really know. They weren't told specifically that, ladies and gentlemen, as to the aggravating, you have to be unanimous. But as to the mitigating factors, any one of you may find a mitigating factor, and you may say that the mitigating factor or factors outweigh any aggravating factors. The jury was – in other words, they were left in the dark, and the Supreme Court said that's not an unreasonable application of the Supreme Court law. But the reason that it's not unreasonable is – there's a couple reasons. The big reason is that it never gets to the first step. There has to be – Mills says there's got to be a finding, and it's got to be reasonably likely that the jury understands it's got to be a unanimous finding. CZAC never gets to the first step. There's never a requirement of a finding in Ohio. I don't get that. Presence – CZAC tells us find those mitigating circumstances that are present. If that isn't a finding, I don't know what is. But there's two things. I mean, the language of the instruction does not tell them that they have to find a mitigator. It just says mitigating factors that are present. But that's not just – but – MR KIRBY How about the average – the reasonable jury sitting in a box? SECRETARY KERRY Exactly. MR KIRBY They're going to look at that, and at this point, under SPECAC, they're going to – they're not, any more than they are in Roland's, going to say, well, we have to – we could decide these individually. We don't have to decide these unanimously. SECRETARY KERRY No, absolutely they are in SPECAC, because they are not – they are not even told whether they need to make individual determinations that each particular mitigating circumstance existed. That's quoting from SPECAC. And because they're not told that they have to make a finding on each mitigating circumstance, they're free to do anything. MR KIRBY Anything they want to do. SECRETARY KERRY With the mitigator. MR KIRBY You're saying they're completely untethered from what to do with mitigating factors. SECRETARY KERRY Exactly. MR KIRBY The Supreme Court might be surprised to hear that that's what they did. SECRETARY KERRY That's what the Supreme Court said. MR KIRBY Well. MR KIRBY Any questions? SECRETARY KERRY No, I have – I have nothing. MR KIRBY Thank you. MR KIRBY Thank you. MR KIRBY The case – your counsel should know what I'm saying, Mr. Secretary. You have to understand, this case was really briefed. MR KIRBY Pardon me? SECRETARY KERRY This case was really very well briefed all around. It doesn't mean there shouldn't be arguments, but this case – so we come in here knowing quite a bit about this. MR KIRBY That's why we're so sure of what we're doing. MR KIRBY You can always at least pretend that we're sure. MR KIRBY Thank you. MR KIRBY For rebuttal, I'm going to – I'm not going to address the Mills claim anymore. I think the Court understands our position on that. I just want to say, with respect to the ineffectiveness mitigation, I don't think I got through my list, a very short list, of why this case is different from the cases in which a new penalty phase was granted on this claim, and especially those very few cases – Outen and Kindler – where there was no hearing. What kind of a – what does the district court have to find in order to grant a hearing? What – with respect to the deficiency of the procedure in the state court, what – doesn't the court have to find if there's been a change in the law or – why – on what basis can a district court grant a hearing and not decide the habeas application on the papers? MR KIRBY Usually, there's two major impediments to a hearing, Your Honor. One is the state court decision, which stands unless it's unreasonable. So the first thing the court has to do before a hearing, it seems to me, is say, well, the state court missed something, or the state court acted unreasonably in granting relief, so we're not going to defer to the state court, sort of as if the state court decision did not happen. And then the court is left with a claim, and in order to decide the claim, the federal court has a hearing. MR GOLDBERG The federal court has a hearing if it thinks it's necessary to have a hearing to decide the claim. MR KIRBY Correct. MR GOLDBERG But the point of the matter is maybe the court looks at all the records and thinks that maybe it's not necessary to have a hearing to decide this claim, even though it's not precluded by the state court proceeding from having the hearing. That could happen, couldn't it? MR KIRBY Correct. It's like any other kind of hearing. Some, you know, it's very weighted, because we're talking about the death penalty, we all want to be sure, but district courts decide every day whether or not to have a hearing. MR KIRBY Now, you took the position that this court should have had a hearing because you just said that their proof was in, their offer, in effect, was insufficient, so that in effect they lose on the equivalent of a motion to dismiss. MR GOLDBERG If that was my, how it came out, that wasn't exactly my argument. The idea is that when, what I raise a motion to dismiss for is that our argument that we should win on the papers doesn't result in our waiving a right to a hearing. The thing, the difference between this and a motion to dismiss or a motion for summary judgment is that the allegations are not presumed true. It's the opposite in habeas. Even if you throw out the, what the state court did, even if you say that was an unreasonable decision or they missed something or they should have had a hearing, the presumption is not that it's true. The presumption is, the question is whether or not there's, you know, a possibility of cross-examination or, and there, there is. MR KIRBY Well, did you ask the court for a hearing on this point? MR GOLDBERG I'm fairly certain that we said that you, we should win on the papers, but you can't grant relief without a hearing. I don't, I must say MR KIRBY I'm fairly sure of that. MR GOLDBERG Yeah, where in the record is that? MR KIRBY I will take a look. I'm fairly certain we did, but I'll say, I'll say this. Even if we didn't, the Constitution of the United States says MR KIRBY Oh yeah, but 24 years later, if you didn't, if you haven't looked for a hearing in 24 years, or, no, that's not fair. That's not fair. MR KIRBY Well, we'd waive, wouldn't it? MR GOLDBERG Your Honor, we have been opposing relief in this case. MR KIRBY But we're talking about a hearing, we're talking, you're saying, we can't do anything without a hearing. We can't, Rick can't be granted without a hearing. MR KIRBY Yes. MR KIRBY So that, you know, all of these years of litigation, have we heard that before? Where in the record is it? MR KIRBY Well, I will look, but I will tell you this, that I, even if I don't find anything, the idea that the court can grant relief of a settled state court judgment without a hearing, no matter what I said, seems to me to break serious ground. MR KIRBY But, you know, I heard every word you said. I also looked at these briefs, and I can't help but wonder whether, now you're telling us, well, you needed a hearing. I can't help but wonder why you would not have said to the state judge, look, they submitted all these affidavits, and the, they have a, me was the attorney at the time, and all that, but we should have an opportunity to examine them about all this, and please give us that. Now, I don't see where, in the opinion, he turned down that request. Maybe it's in there. It's a big, long opinion. It deals with a lot of things that aren't even involved in this case. MR KIRBY I don't, I don't think he said that. MR KIRBY Did he ever turn you down on a request? MR KIRBY I don't, I don't think he said that. I don't want to go, keep going over this, but, but I, I, I must say, I, there's this basic point. It's as if we were filing a summary judgment motion, saying on the papers we win, and the court said no, that's false. That doesn't mean there's no trial. At this point, we've said on, our argument was rejected by the district court. MR KIRBY It might mean there was no trial, though, if there were cross motions for summary judgment. In other words, the fact that the court, in effect, they were saying, look, we have all these papers, we're entitled to release. If you have cross motions for summary judgment, the court might deny them both, but it might deny one and grant the other. MR KIRBY Well, I think now that the, the, the analogy is getting a little strange, and I'm not sure I'm following it anymore. But my point is, is there is a settled state court judgment. We said on the papers we should win, and by that we did, there, I don't, frankly, I don't even understand the argument that we have waived our right to, to a hearing by which the, the facts necessary to overturn the state court judgment are proved. I, I don't even, I, I'm having trouble, I have trouble wrapping my mind around that. I, I, I understand generally the point of waiver. I think this is one of those things that's not subject to it. This is, this talks, this is the whole, it's not like it's inconsistent. MR KIRBY I'm not, I didn't use the word waiver. That's your word. All it seemed to me was you might have said to the district court, look, they say all these things, but how do we know this is true? Shouldn't we be able to question? MR KIRBY Well, Your Honor, as, as Your Honor knows, there were something like 400 pages of briefs that we were responding to in this case. Sometimes I wish I had said, put in a different sentence here or there. I don't think what, what we're saying now is at all inconsistent with what we said below. I, I, I think Your Honor, Your Honor's understand my, my point about this. MR GOLDBERG I guess, I think my personal discomfort is where this, this issue has been litigated so thoroughly, so heavily for so long, and I can't remember seeing anything much about a hearing being requested or denied. That it seems just a little late in the day to be saying, okay, now we got to start all over. That, that's. MR KIRBY I understand. MR GOLDBERG It was a law. MR KIRBY You know, our whole point since 1996, when these affidavits were first filed, is that they were not credible. On their face, they were not, they were not enough to overturn the judgment. Why is that?  MR GOLDBERG Doesn't somebody have to make a finding of that, a credibility determination? MR KIRBY Well, the PCRA court did. MR GOLDBERG But, but not after a hearing. MR KIRBY No, but that, that, there's not a requirement of a hearing. MR GOLDBERG Well, that's the same thing to say it's not credible, and it's not enough to overcome the judgment. Because not credible, I mean, you don't believe what's said, but they can be credible in the sense that you believe it, but that it's simply inadequate to overcome judgment. MR KIRBY That, that's also true. But we did make the credibility argument. I mean, so, so in a sense, we were saying. MR GOLDBERG But now you're saying we can't. MR KIRBY You can't rely on. MR GOLDBERG We can't make that same determination. We have to have a hearing. We have to. MR KIRBY That's correct, because the judgment weighs, weighs it in favor of, of if there's not, if there's not a question, then, then the answer is not, the both parties are, are, are now equal. The presumption is all on the side that the settled state court judgment remains final, unless, and this is, this is the, the habeas statute, unless there is proof, it is proved that the, not that it might be, and not that it's waived, but it is proved that the judgment is unconstitutional. That's, that's where we are. And that's why the idea that we've given up a right to a hearing because we've said all these years that they're on their face, not enough for a hearing. MR GOLDBERG I tell you, you'd be happy if you had the result that, well, we agree with you on meals and we just summarily remain for a hearing on the other point and tell the court to reconsider to give you discovery. MR KIRBY All things being equal, Your Honor, let me just get this out before I sit down. I'm sorry I'm taking up so much time. The reasons why this case is different, number one, no contemporaneous records corroborating the affidavits. Number two, Rollins testified at the sentencing phase and said, I am innocent, I didn't do it, which is something that none of the other cases dealing with ineffectiveness for mitigation evidence dealt with. And number three, of course, the jury didn't know about his other murder. That's a serious prejudice question. We got into that a lot in our brief. MS GOTTLIEB Which verdict, the 82 murder? MR KIRBY The 82 murder, which hadn't happened yet. MS GOTTLIEB That didn't come until 88. MR KIRBY Yes, but MS GOTTLIEB That verdict wasn't returned until 88. MR KIRBY That is correct. But it's our, I know that MS GOTTLIEB Two years after the trial. MR KIRBY That's correct. But we believe that A, it was admissible, based, if the other side had come forward with expert testimony about impulse control, we could have gotten to the fire baton. MS GOTTLIEB You mean at some sort of a hearing? MR KIRBY Yes. MS GOTTLIEB Oh, oh, not at the trial. MR KIRBY No, at the penalty phase, if this is something the counsel would have had to have taken into account. In other words, I'm making a prejudice argument. MS GOTTLIEB That's a great reason to ask for a hearing if I were you. MR KIRBY Well, if we're doing it again.  MS GOTTLIEB Okay, thank you. Well, we now turn to Mr. Rollins' appeal. Mr. Lowy. MR LOWY Thank you, Your Honor. First of all, on the baton issue. The prosecutor in this case used six of his first strikes. MR KIRBY Before I, you get to, and I promise I won't interrupt too quickly again. What relief are you seeking on the baton issue? MR LOWY Actually, on both the baton issue and on the ineffectiveness issue dealing with the guild innocence phase, on both those claims we're asking for a remand for an evidentiary hearing. MR KIRBY Let me ask you this about the baton issue. Twenty-four and a half years ago, this jury was selected. MR LOWY Yes. MR KIRBY Where is Judge Sabo? Where is the prosecutor? Where is Meehan? How do you do an evidentiary hearing 24 and a half years later? And even if somehow you were to, at a hearing, establish a prima facie case, and the record is very poor so far, how in heaven's name can race-neutral reasons be submitted 24 and a half years later as to each of the jurors that was struck by the state? MR LOWY Well, it may be difficult, but it has been done before in cases like Hardcastle. MR KIRBY Where is Judge Sabo? MR LOWY Judge Sabo is deceased. MR KIRBY Okay. Now, Judge Sabo, the trial judge, has a role in all of this. MR LOWY Yes. MR KIRBY Because the trial judge was in that courtroom and saw the jury selection. And in fact, Judge Sabo has already made some findings as to demeanor and reasons in his September opinion. MR LOWY Yeah. And critically, what Judge Sabo said two or three times was, well, as long as you've got any African-Americans seated on the jury, you don't have a Batson violation. MR KIRBY No. Judge Sabo, in his opinion of September 4th, he said there was no prima facie case. He went into the prosecutor's demeanor. He went into the prosecutor's reasons for his strikes because the people that he struck, and he didn't identify as to whether people were African-American or white. He said because they were not inclined to impose the death penalty. And he talks about the importance of the trial judge in seeing what's going on before him or her. Now, Judge Sabo, you say, is dead, right? So we don't have the trial judge any longer. Can you reasonably believe, even if the prosecutor is still with us and available, that he should be expected to have any clue as to why, I think the defense excused 16 jurors and prosecutor excused only 27 or 28 people 24 years later, why each one or why his, the prosecutor's, strikes were exercised in a racially neutral fashion? How can that be? How can we even talk about a hearing, practically speaking? We can talk about a hearing quite practically because, you know, to begin with, we know that the prosecutor was keeping track of the race of people who were struck. For the life of me, I cannot understand what the problem with that would be because he realized that he could be called on that. You know, saying he was acting in a discriminatory way and he wanted to have the records. You know, he's damned if he does and he's damned if he doesn't. You know, I've seen a lot of cases. I've seen like discrimination cases where they say, well, we don't know if there was discrimination in the employment. We don't have any records, you know, and that's no good. I mean, was it wrong to keep records? Well, I think that's it. Wasn't he keeping records like he was making points for the American Express card? Oh, there goes another one. I got 50 points. I mean, he was keeping records for a very good reason. He knew he might have to explain himself. I think that's a debatable point, Your Honor, but what I was trying in response to Judge Barry, what I was, the reason that I refer to this is that that will be a contemporaneous record of who was struck and generally speaking, the prosecutors write down reasons as well, so you can go back and look at that. All we know, and we only know it from the prosecutor, we don't know it from anything that Meehan did, is that the prosecutor struck six African-Americans and five whites for a total of 11 strikes, right? And the final jury was comprised of seven whites and five African-Americans and one African-American didn't show up and was replaced with a white alternate. So there were four blacks and eight whites that ultimately heard the case. That's all we know as a matter of the race of the jurors and the number of strikes. We don't know the important number and racial makeup of the entire veneer, so we can't compute an exclusion rate. That's all we know. That's all we know. And the strike rate, the strike rate was 54.5 percent, the prosecutor's strike rate of blacks versus whites. In Abdul-Jamar, it was 66 percent and we found that that was not enough for a time of face you gave me. That's all we have. That's all we have. And that's, and, but there is not enough, there is not enough to preclude the possibility that Mr. Rollins can show he's entitled to relief and the way that that can be done is through discovery and a hearing. And I do want to. What's the discovery going to show? The discovery is going to show we're going to, we will then, we can then determine the race of the entire veneer rate and we can, we can determine the exclusion rate. How are you going to do that? Just as a matter of interest. Because, because, because of the, of the record keeping that the prosecutor did, we will, we will get that information. You don't know the prosecutor has that information. He has not so far disclosed it since 24 and a half years later. That's true. And we've, we've been asking for that information ever since we filed Mr. Rollins' first petition and it hasn't ever been divulged. Well, assuming for the purpose of record that it's possible to have this hearing 20 some odd years later, why, if it were possible to do as a practical matter, where on this record have you entitled yourself to that type of relief when according to Abba Jamal, you have to make a, not a musing about how many blacks and how many whites and the strike rate and so forth. You've got to make a decertive declaration forcing, in effect, the judge to make a, a determination after the prosecutor gives a race neutral reason where the defense attorney in this case really didn't push the envelope to that point. Not to the point that Abba Jamal required. Well, I, I disagree with that, Your Honor. The defense counsel objected during Fort Dyer, which did not happen in Abba Jamal. And what happened after defense counsel objected was that... But what did he say when he objected? He didn't ask for a ruling from... He didn't ask for an explanation from the prosecutor and a ruling from the court. What did he say? I, I've read it myself. Well, he... He was musing and, and he's talking about the subject. But did he really make a Batson objection calling for a ruling, a declaration by the prosecutor and a ruling by the court? Well, he... First of all, I would point out that this was very shortly after Batson. So people were a little unclear about... Months after Batson. Yes. So, so... But you had the state case. Was it Commonwealth East Fence? Which required, which required careful record keeping. I, no, I don't think that existed at the time of the trial. Mark, but whatever... And, and in any case, let me... The day after Batson. It's required that the defense attorney call upon, in effect, a demand that, that, you know, discrimination may be afoot here and require the prosecutor to come up with his reason for whatever the challenge was. And which then triggers the necessity that the trial judge rule. Where in this... Show me where this objection was lodged with the court, which forced the Batson response by the prosecutor and ruling by the court. And not just amusing that, you know, about this. It's interesting, he's, you know, an observation that he's making. Right. What, what happened here was... No, no. What, where... Judge Howard asked you a specific question. Where did he call for a ruling? What, where? What page of the record? And I would like... Okay. He did not specifically ask for a ruling. Now let me explain what did happen. What did happen is he objected. He said there's systematic exclusion of blacks. The prosecutor said, no, that's not true. That's an observation. That's an observation. All right. The judge said, no, there's not systematic. There's a black in the jury already. And, and after the whole case is over, there's a, there's only a strike rate of 55%. But where, he's made an observation. No, he... Make an objection to the seating of the juror. He, he, he objected saying that, you know, what we're getting now is... I've read the first words. I've read it myself. Let's get to the record. A819 and A1021. Judge Barry's going on counsel with you here. That doesn't... Um... Let me, I, I can't find the pages of this. This is, this is what happened. He made an objection that you're going to have a batch in hearing, sir. I just don't like to say it. So you better say something in response. Well, I'm trying to, with all respect. He, he objected to the exclusion of, of one of the jurors. He said this is becoming a systematic exclusion. Prosecutor said, no, no. There's, there's an African American already on there. The prosecutor also said, I'm keeping, I'm keeping track of everything. I will have a record for the court at the end of the proceeding. Did anyone ever ask him to produce that record? Yes. He, he offered it. He came in an A819 and he said at that point that he had promised to say something. And at that point, there were four blacks and five whites elected. So it was, you're only midway through. He put that on the record. That was an A819. Then just before the jury is sworn, I think it's just before the jury is sworn. He comes in again. This is an A21 to 24. And Meehan says, well, wait a minute. We can take this up somewhere during the trial. We don't have to do it now. That's it. And they excused, they excused the one African American woman who didn't show up and went on with the trial. That's it. I don't see in this record he ever asked for, for a ruling. Certainly not, not after they had the jury in the box. What happened, there's, there's two pieces of the record that I'm not, not finding while I'm standing here. There is a, there is a charging conference at the end of the trial where there, where there is some discussion of this. And at that charging conference is when Judge Sabo says, well, look, there's blacks on the jury, so there's no Batson violation. And Batson is specifically mentioned. And then in post-verdict motion hearing, again, the same, the same discussion comes up. That's after the jury's been sworn. That's after they've been selected and sworn in the box, right? That's true. But, you know, I, I think the, I think the final point I'm going to make about Batson is this, that, that the, the, the state courts did not apply this particular version of a contemporaneous objection rule. If, if we're going, we're, we're extending Abu-Jamal beyond and beyond what was in Abu-Jamal. I mean, there was first Abu-Jamal where there's no objection at all. Then there was Lewis where there's no objection by counsel. Here there's an objection by counsel. Prosecutor says, I'm going to make a record of everything so it's all there in a nice package for the judge to rule on. And, and the judge does rule on it post-trial. That's, I, I think it's, I think it's inappropriate to make up a federal contemporaneous objection rule that goes back to there and says that was, that failed to preserve the claim. I thought your brief was very interesting that, that, you know, the prosecutor is, is doing all this keeping track and everything, but you know, as defense attorney, the last person in the world you should rely upon if you've got a defense of some sort is the guy on the other side of the, of the, of the counsel table. He can't say at this point, well, I didn't make an objection because I was relying on my adversary to prove my case. That just is hilarious if you look at it. So, so I'll leave it with this. Your best argument is that there was some discussion about maybe there's some discrimination afoot and we'll talk about it later. But as I understand Batson, it's, the theory of it is that it's for something to determine who should be sit, who should sit in the jury and be sworn. Once they're on that jury and sworn, you've got a jury. You can't say later on, hey, I had a Batson claim. Because Batson talks about making the record and remedying and giving a remedy if a remedy is required. And that issue would be done, would have been done 24 and a half years ago. And, and my, the final thing that I'll say is that Judge Sabo made very clear during the trial that his view was if there's any blacks on the jury, there's no Batson violation. And so there's no. I think what he made very clear is the only thing that Meehan was arguing was that there weren't enough blacks on the jury. Well, and that wasn't enough for a prima facie case. And that's really all Meehan did argue. But we, we, you have two other issues, which I know you're going to want to address. Well, it's really, it's really one other issue. And this is, this is dealing with counsel's ineffectiveness at the guilt phase. And essentially what counsel did was he really tried this case as if there was no defense to the charge of first degree murder. Just sort of cross-examine people and see what happens. But there was a huge piece of exculpatory information that counsel did not know until virtually the end of trial, which is his client's blood type was O. There were type A blood group substances on a cap worn by the shooter at the homicide scene. There was type A blood at the 21st Street scene. And if counsel had known those basic fundamental facts about the evidence in the case, reasonable counsel would not have tried a case like a case where there's no defense. Reasonable counsel would have been out looking for more evidence to bolster the exculpatory blood type evidence. And the place that counsel could have gone, the place that we went, was to go to a crime scene expert to look at some of the evidence at both scenes and see what that evidence would show. And what it would have shown in this case is first of all, as demonstrated by the neuropsychological testing that we did, Mr. Rollins is strongly right-hand dominant. Now, there was a statement, the statement by the witness, Violetta Centrone, was that